***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. The employer-employee relationship existed between defendant-employer and plaintiff on or about November 20, 2003, the date of the injury in this claim.
3. The carrier on the risk is Gallagher Bassett Services, Inc.
4. Plaintiff's average weekly wage as of November 20, 2003 was $1,078.08, which results in a compensation rate of $674.00.
5. The parties have attended a mediated settlement conference.
6. Plaintiff sustained an admittedly compensable injury to his lower back, left hip, left leg and left foot on November 20, 2003, for which defendants have accepted liability by filing a Form 60 Employer's Admission of Employee's Right toCompensation.
7. The issues for determination by the Full Commission are: whether defendants have conducted reasonable vocational rehabilitation; whether plaintiff has complied with vocational rehabilitation and should be compelled to attend computer classes; whether plaintiff's temporary total disability payments should be suspended or terminated; whether plaintiff is permanently and totally disabled; and whether plaintiff is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission forms and filings
 • Exhibit 3: Plaintiff's medical records
 • Exhibit 4: Vocational rehabilitation reports
 • Exhibit 5: Medicare set-aside analysis *Page 3 
 • Exhibit 6: Medical bills
 • Defendants' Exhibit 1: Computer class course description
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 67 years old, with a date of birth of June 27, 1942. Plaintiff served in the U.S. Army from 1964 through 1967 and received his GED while he was in the Army. He was honorably discharged and has resided in Clinton, North Carolina since 1967. Plaintiff took some business administration courses at Sampson Community College in the early 1970s, but did not receive a degree.
2. In 1967, plaintiff started with defendant-employer's precursor, Carolina Telephone, as a telephone service technician. Plaintiff remained in that job for 36 years with defendant-employer, through several corporate name changes, until his injury in this claim on November 20, 2003. Plaintiff has no adult work experience other than this job with defendant-employer.
3. In his job as a telephone service technician, plaintiff installed single and dual lines in homes and businesses and performed all types of repairs. The Dictionary of Occupational Titles lists this job as medium duty. The job required plaintiff to do a significant amount of climbing, standing on ladders, bending, stooping and lifting weights up to 75 pounds.
4. Since plaintiff sustained his admittedly compensable low back injury in this claim on November 20, 2003, he has received extensive medical treatment, provided by defendants, through his primary care provider, Dr. Albert Verrilli, and several specialists. *Page 4 
5. The MRI plaintiff underwent on December 3, 2003 showed multiple-level disc protrusions from L3 to S1. Plaintiff's medical providers have not felt that plaintiff was a surgical candidate and plaintiff has been treated conservatively.
6. Plaintiff treated for a lengthy period with Dr. Scott Sanitate, who prescribed multiple injections, medications and a TENS unit.
7. On April 11, 2007, plaintiff had a follow-up evaluation with neurosurgeon, Dr. Robert Allen. Dr. Allen continued to believe that plaintiff's chronic low back and left radicular leg pain would not be effectively addressed surgically and referred plaintiff for pain management.
8. Following Dr. Allen's April 11, 2007 recommendation, plaintiff began treating with Dr. Eskandar Morkos, an anesthesiologist and pain management specialist. Plaintiff continues to treat with Dr. Morkos, receiving prescription medications as well as periodic epidural steroid injections that provide him some relief for one to two months each. Plaintiff also receives some medication management through Dr. Verrilli.
9. Plaintiff has been on light duty work restrictions since shortly after his November 20, 2003 injury. His current restrictions are no lifting greater than 40 pounds and avoidance of repetitive flexion/extension of his lumbar spine.
10. After his November 20, 2003 injury, plaintiff tried to continue to work in various capacities, but was unable to do so successfully. Defendant-employer had no physically suitable work for plaintiff.
11. Defendants began paying and continue to pay plaintiff ongoing temporary total disability compensation in the amount of $688.00 per week, pursuant to a Form 60 dated March 23, 2004. *Page 5 
12. In 2007, plaintiff began having symptoms of depression. Dr. Verrilli prescribed an anti-depressant for him in October 2007. Dr. Verrilli felt that plaintiff's depression was due to his chronic pain. Plaintiff had never received any mental health treatment prior to his work injury.
13. In July 2008, defendants assigned Anthony Enoch, a rehabilitation professional, to conduct vocational rehabilitation with plaintiff. Mr. Enoch did an initial vocational assessment on July 24, 2008. Mr. Enoch then met with plaintiff several more times and prepared an individualized written rehabilitation plan that set out the vocational goal as "to obtain a full-time position." The plan noted that plaintiff's physical restrictions were no lifting over 40 pounds and avoidance of repetitive flexion of the lumbar spine. It also noted that plaintiff's pre-injury wage was $21.00 per hour.
14. Early in his handling of plaintiff's claim, Mr. Enoch determined that it would be appropriate to have plaintiff complete a basic computer skills course at Sampson Community College. Mr. Enoch testified that he viewed this course as a baseline to determine whether continued vocational rehabilitation was appropriate. Mr. Enoch began insisting that plaintiff attend a computer class that lasted three hours, twice a week for five weeks.
15. Plaintiff attended one of these classes and made it nearly the entire three hours. Because of his low back pain and left leg symptoms, plaintiff had to get up constantly and move about the room, which caused plaintiff embarrassment. Plaintiff also had trouble concentrating on the subject matter. Plaintiff has not been back to the computer class since that attempt, although the instructor told him it was fine for him to sit and stand as needed.
16. At the hearing before the Deputy Commissioner, defense counsel asked plaintiff about a similar computer course that is available and that only meets for one hour at a time, three *Page 6 
days per week for ten weeks. Plaintiff testified he would be willing to try the shorter class. However, Mr. Enoch did not mention the shorter computer classes in any of his pre-hearing reports.
17. Defendants sought and obtained an Order compelling plaintiff to comply with vocational rehabilitation efforts. On October 20, 2008, Executive Secretary Tracey H. Weaver filed an Order requiring both plaintiff and defendants to comply with the Commission's Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims.
18. Despite their continued vocational rehabilitation efforts, neither Mr. Enoch nor plaintiff has located any suitable employment prospects for plaintiff.
19. Mr. Enoch could not say how the computer class might lead to suitable employment for plaintiff, only that the course was simply a prerequisite for further training. The computer class is part of a larger, five-month curriculum called "Software for Career Development" that Mr. Enoch would ultimately recommend for plaintiff. Mr. Enoch admitted that there is no evidence that plaintiff's completion of these courses would lead to suitable employment for plaintiff.
20. In the late summer of 2008, over a period of about eight weeks, plaintiff began displaying very erratic behavior, including crying episodes, constant agitation, and manic behaviors that disturbed his family and treating physicians. Among his other problems, he was having significant insomnia. Plaintiff went for a period of several weeks without appreciable nighttime sleep.
21. On August 27, 2008, Dr. Verrilli referred plaintiff on an emergency basis for an evaluation with Dr. Muthiah Sabanayagam, a psychiatrist. Dr. Sabanayagam diagnosed plaintiff with bipolar disorder I, mixed severe with psychotic features. Dr. Sabanayagam immediately *Page 7 
took plaintiff off all of his medications, including the narcotic pain medications that Dr. Morkos had prescribed, and placed him on anti-psychotic medications. Plaintiff also reported to Dr. Sabanayagam that he was under pressure in his workers' compensation claim to return to work, particularly from Mr. Enoch.
22. Dr. Sabanayagam recommended inpatient hospitalization, to which plaintiff agreed in early October 2008. Plaintiff has continued to treat with Dr. Sabanayagam, who has adjusted plaintiff's medications in consultation with Drs. Morkos and Verrilli. Plaintiff is no longer on narcotic pain medications. With Dr. Sabanayagam's treatment, plaintiff has gradually started recovering from his manic episode. Dr. Sabanayagam believed that plaintiff would continue to need maintenance doses of anti-psychotics for a long time and that he was susceptible to further breakdowns.
23. Plaintiff believed that his late-summer 2008 manic episode was at least partly brought on by Mr. Enoch's manner and demands that plaintiff pursue vocational rehabilitation and get back into the workforce. Plaintiff testified that Mr. Enoch's manner caused him anxiety and stress. Nonetheless, plaintiff continued to meet with Mr. Enoch as scheduled. As Mr. Enoch confirmed, plaintiff has attended all the meetings and his only alleged non-compliance with vocational rehabilitation has been his failure to complete the computer course.
24. Plaintiff and Mr. Enoch have never discussed plaintiff's mental health issues, only his physical pain.
25. At the hearing before the Deputy Commissioner, defendants requested, and the Deputy Commissioner allowed, an independent psychiatric evaluation of plaintiff. Plaintiff underwent this evaluation on July 7, 2009 with Dr. C. Thomas Gualtieri, a neuropsychiatrist. Plaintiff submitted to a battery of cognitive testing, and the results led Dr. Gualtieri to believe *Page 8 
that plaintiff has mild cognitive impairment, possibly the beginning of the onset of Alzheimer's disease. Dr. Gualtieri recommended cognitive testing for plaintiff at regular intervals.
26. At his deposition Dr. Morkos stated that he doubted that plaintiff could return to work with his ongoing significant low back pain and symptoms and after being disabled for so many years. Dr. Morkos confirmed that it was consistent with his findings that plaintiff would not be able to sit for a three-hour class.
27. As Dr. Sabanayagam testified, it is very likely that plaintiff had a hereditary disposition to develop bipolar disorder, but the disorder was not triggered until the stressors in his life,i.e., his disability, severe pain, and pressure to return to work, became overwhelming enough. Dr. Sabanayagam indicated these factors were "partly responsible" for bringing plaintiff to the point of needing psychiatric treatment. As Dr. Sabanayagam further testified, another major factor in his late-summer 2008 manic episode was the high levels of narcotics he was taking.
28. Dr. Sabanayagam saw limited therapeutic value in the computer class, noting that he did not feel that plaintiff could handle the pressure and structure of a classroom setting with other students.
29. Dr. Sabanayagam expected that plaintiff might improve further with more psychiatric treatment, and he expected that, after about 18 months of such treatment, he could reconsider whether plaintiff might be able to take courses and/or return to work. At the time of his deposition on July 13, 2009, Dr. Sabanayagam felt that any classes or other structured activities would very likely worsen plaintiff's mental health condition. He also stated that plaintiff could not sit longer than five minutes or absorb information in classes. *Page 9 
30. Dr. Sabanayagam testified that he did not believe that plaintiff could work in any form of paid employment because of his severe mood disorder, the severe side effects of his medications and his poor attention and concentration.
31. Dr. Gualtieri testified that he believed that the narcotic pain medications had precipitated plaintiff's late-summer 2008 manic episode. He did not believe that plaintiff's mild cognitive impairment was disabling or that the long-term persistence of plaintiff's mood disorder was related to this workers' compensation claim.
32. Dr. Gualtieri saw no "brain-based" reason plaintiff could not take the computer course, but he could not comment on any physical limitations plaintiff had. Regarding the computer course, Dr. Gualtieri stated that the "likelihood of a vocational outcome in the competitive sector is small" because of plaintiff's advancing age, his low back condition, his long-term disability and his emerging cognitive issues. Dr. Gualtieri saw the computer course as being potentially therapeutic for plaintiff's mental condition.
33. Dr. Gualtieri would approve a trial return to work for plaintiff if physically suitable employment could be located. Dr. Gualtieri stated that he had a "low threshold" for approving work trials. He could not think of any specific job plaintiff could do, but he stated essentially that, in his opinion, there is always some job that anyone can do, no matter what their condition.
34. To the extent that the opinions of Drs. Sabanayagam and Gualtieri are in conflict, the Full Commission gives greater weight to the testimony and opinions of Dr. Sabanayagam, as the treating psychiatrist who has seen plaintiff for several visits, as opposed to Dr. Gualtieri's one-time evaluation. *Page 10 
35. Mr. Enoch acknowledged that he knew of no suitable work that was available to plaintiff in the open and competitive labor market within a reasonable distance of plaintiff's residence, given plaintiff's age, educational level, work experience, physical restrictions, mental condition and pre-injury wage.
36. Based on the testimony and evidence of record, the Full Commission finds that the working relationship between plaintiff and Mr. Enoch had deteriorated as of the hearing before the Deputy Commissioner. Plaintiff expressed that he essentially felt threatened by Mr. Enoch and that Mr. Enoch showed a hostile attitude toward plaintiff, repeatedly referring to him as "the guy." The two have had disagreements, with plaintiff alleging at times that Mr. Enoch has made false statements in his reports.
37. At the time of the Deputy Commissioner's hearing, plaintiff continued to have problems sitting and standing for any significant length of time due to his low back symptoms. Plaintiff's sleep problems had improved since his late-summer 2008 manic episode, and he attributed the improvement to his coming off the narcotics and starting on sleep aids.
38. Plaintiff did not believe he was capable of completing the computer skills course physically or mentally. He did not believe that he was capable of returning to work in any employment because of his pain and concentration issues.
39. Defendants denied plaintiff's psychiatric claim in a Form 61 dated June 4, 2009. In the Pre-Trial Agreement, defendants reserved as an issue whether plaintiff timely reported his psychiatric claim. Defendants did not address at the Deputy Commissioner or Full Commission level the compensability of the psychiatric claim or the alleged untimely reporting of said claim and, therefore, these issues are deemed abandoned and not addressed in this Opinion and Award. *Page 11 
40. Defendants filed a Form 24 Application on December 31, 2008 seeking to have plaintiff's temporary total disability compensation suspended for his alleged non-compliance with vocational rehabilitation. On February 27, 2009, former Special Deputy Commissioner Christopher B. Rawls filed an Order finding that he was unable to reach a decision on the Form 24 in the administrative forum. Thereafter, this claim was docketed for hearing before the Deputy Commissioner.
41. Defendants were reasonable in the defense of this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On November 20, 2003 plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's depression and mood disorder are a direct and natural result of his compensable low back claim and are thus compensable. Starr v. Charlotte Paper Co.,8 N.C. App. 604, 175 S.E.2d 342 (1970).
3. Plaintiff has not shown at this time that he is permanently and totally disabled. N.C. Gen. Stat. § 97-29. Particularly given Dr. Sabanayagam's willingness to reassess plaintiff's prospects after further treatment, it does not appear that further reasonable vocational rehabilitation, re-initiated at the appropriate juncture, is altogether futile.
4. The vocational rehabilitation that defendants have conducted thus far, particularly Mr. Enoch's insistence upon the computer course, has not been reasonable and in compliance *Page 12 
with the Commission's rehabilitation rules. Rule VIII.G. of the Industrial Commission Rules for Utilization of Rehabilitation Professionals prohibits the rehabilitation professional from continuing placement activities that do not appear reasonably likely to result in placement of the injured worker in suitable employment. Based on the evidence of record, the three-hour computer course does not meet this standard. N.C. Gen. Stat. § 97-25; Rule VIII.G., North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals.
5. The refusal by plaintiff to continue to attend computer classes was reasonable and justified under the circumstances present in this case. As such, defendants are not and have not been entitled to suspend or terminate plaintiff's temporary total disability compensation, and their December 31, 2008 Form 24 Application should be disapproved. N.C. Gen. Stat. § 97-25; Rule VIII.G., North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals.
6. Vocational rehabilitation should be suspended in this claim unless and until plaintiff's treating physicians agree that plaintiff is physically and mentally able to engage in reasonable vocational rehabilitation efforts pursuant to an individualized plan. Any further vocational rehabilitation should be initiated with a different rehabilitation professional, as it appears that a working relationship between plaintiff and Mr. Enoch cannot be restored. Id.
7. Plaintiff is entitled to continuing payments of temporary total disability compensation by defendants at the weekly rate of $674.00 until he returns to work or further Order of the Commission. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to have defendants pay for the psychiatric treatment he has received from Drs. Verrilli and Sabanayagam, including, but not limited to, prescriptions, *Page 13 
consultations, diagnostic testing and mileage reimbursement. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
9. Dr. Sabanayagam should be designated as plaintiff's treating psychiatrist, and plaintiff is entitled to have defendants authorize and pay for Dr. Sabanayagam to provide further treatment for plaintiff's compensable depression and mood disorder, including, but not limited to, prescriptions, consultations, diagnostic testing, referrals, psychological counseling, and mileage. Dr. Sabanayagam should be provided with Dr. Gualtieri's report and should provide treatment in consultation with Drs. Morkos and Verrilli. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
10. Drs. Morkos and Verrilli should be designated as plaintiff's treating physicians for his pain management needs and for his compensable low back condition. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
11. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The December 31, 2008 Form 24 is disapproved, and defendants shall continue to pay weekly temporary total disability compensation to plaintiff at the rate of $674.00 per week until plaintiff returns to work or further Order of the Commission. *Page 14 
2. Vocational rehabilitation is hereby suspended in this claim, until such time as plaintiff's treating physicians agree that plaintiff is physically and mentally able to engage in reasonable vocational rehabilitation efforts, pursuant to an individualized plan.
3. Should vocational rehabilitation be resumed in this claim, it shall be done with a different rehabilitation professional than Mr. Enoch and in accordance with the Commission's rehabilitation rules.
4. Defendants shall pay for the psychiatric treatment that plaintiff has received from Drs. Verrilli and Sabanayagam, including, but not limited to, prescriptions, consultations, diagnostic testing and mileage reimbursement. If plaintiff and/or any third-party payor(s) have paid for such treatment, defendants shall reimburse such payor(s) in full.
5. Dr. Sabanayagam is designated as plaintiff's treating psychiatrist, and defendants shall, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for Dr. Sabanayagam to provide further treatment for plaintiff's compensable depression and mood disorder, including, but not limited to, prescriptions, consultations, diagnostic testing, referrals, psychological counseling, and mileage. Dr. Sabanayagam shall be provided with Dr. Gualtieri's report and shall provide treatment in consultation with Drs. Morkos and Verrilli.
6. Drs. Morkos and Verrilli are designated as plaintiff's treating physicians for his pain management needs for his compensable low back condition, and defendants shall, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for the treatment that either of them recommends for said condition, including, but not limited to, prescriptions, referrals, diagnostic testing, physical therapy, injections and mileage. Drs. Morkos and Verrilli shall provide treatment in consultation with Dr. Sabanayagam. *Page 15 
7. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: 25% of any lump sum due plaintiff shall be deducted and paid directly to plaintiff's counsel. Thereafter, plaintiff's attorney shall receive every fourth compensation check due plaintiff.
8. Defendants shall pay the costs. As part of their costs, if they have not done so already, defendants shall pay an expert witness fee to each of the testifying physicians, the amounts of which were set in previous Orders of the Deputy Commissioner .
This 25th day of October, 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1